*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

POWER-TEK SOLUTIONS SERVICES, LLC,
  *Plaintiff-Appellant,*

  *v.*

TECHLINK, INC.,

  *Defendant-Appellee.*

No. 03-4342

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-02050—Patricia A. Hemann, Magistrate Judge.

Argued: March 10, 2005

Decided and Filed: April 4, 2005

Before: MARTIN and GILMAN, Circuit Judges; COHN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Debra J. Horn, MEYERS, ROMAN, FRIEDBERG & LEWIS, Cleveland, Ohio, for Appellant. Philip Oliss, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Debra J. Horn, MEYERS, ROMAN, FRIEDBERG & LEWIS, Cleveland, Ohio, for Appellant. Philip Oliss, James D. Thomas, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge. In this diversity case, the sole issue presented on appeal concerns the propriety of the magistrate judge's entry of judgment as a matter of law on behalf of Techlink, Inc. on Power-Tek Solutions Services, LLC's breach-of-contract claim. For the following reasons, we AFFIRM.

_____

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I.

Before Eric Bischof started his own company in 1999, which he called Power-Tek Solutions Services, LLC, he worked for a demolition company called Complete Demolition Services. Consumers Energy Company hired Complete Demolition to perform demolition and scrapping work at its power plant facility in Midland, Michigan. The Midland facility was originally planned to be a nuclear power plant, but Consumers Energy halted construction of the nuclear portion of the plant because of soil remediation problems and other impediments. While the non-nuclear portion of the plant ultimately became an operational facility, Consumers Energy decided to scrap the equipment and materials from the nuclear portion of the plant and hired Complete Demolition to do the work. Bischof was the Complete Demolition employee who was primarily responsible for attempting to sell the nuclear equipment. Those duties required him to work closely with Clancy Pitsch, the Consumers Energy employee who was primarily responsible for investment recovery.

Techlink is a marketing, sales and engineering company that buys nuclear equipment from cancelled nuclear facilities, recertifies and rededicates the equipment for use, and then sells the equipment to end-user nuclear facilities. In March 1996, Techlink received an inquiry from a utility company seeking a component for a nuclear reactor. Allan Kemp, Techlink's president, inquired with Consumers Energy about the nuclear reactor at the Midland facility. Consumers Energy directed Kemp to Bischof. Bischof indicated that he was interested in working with Techlink to sell the reactor along with any other nuclear equipment from the facility. During 1996, Techlink purchased several pieces of equipment from the Midland facility for possible resale to its customers.

Complete Demolition's work for Consumers Energy at the Midland facility was set to end in 1997. Bischof alleges that in 1996 he, individually rather than on behalf of Complete Demolition, and Kemp, on behalf of Techlink, entered into an oral agreement concerning the future marketing of Midland nuclear equipment. According to Bischof, the two men agreed that upon the expiration of Complete Demolition's contract with Consumers Energy, Bischof and Techlink would work together to market and sell the Midland nuclear equipment and would evenly split the net proceeds derived from any sales. Bischof explains that Techlink was to conduct the negotiations and communications with potential buyers and that Bischof was to handle all contacts and dealings with Consumers Energy and Pitsch. This alleged agreement is referred to as the alleged 1996 agreement, and Techlink has consistently denied its existence.

No Midland nuclear equipment was sold in 1997 or 1998. In early 1999, Bischof left Complete Demolition and formed his own company, Power-Tek. According to Bischof, he then approached Consumers Energy, through Pitsch, about the prospect of Power-Tek—as opposed to Bischof individually—and Techlink continuing to market the nuclear equipment from the Midland facility. Bischof alleges that Pitsch offered Power-Tek an exclusive marketing agreement with Consumers Energy, but that he declined the offer "because he had already made an agreement [the alleged 1996 agreement] with Techlink." After receiving Consumers Energy's approval for Power-Tek and Techlink to market the nuclear equipment, Bischof informed Kemp about these developments. Bischof alleges that he and Kemp "discussed and agreed that Power-Tek, instead of Bischof individually, would continue with the same agreement initially entered into by Techlink and Bischof" in 1996, including the even-split provision. The alleged substitution of Power-Tek for Bischof is referred to as the alleged 1999 agreement or the alleged 1999 substitution.

During the summer of 2000, two sales of nuclear equipment from the Midland facility were effectuated. Power-Tek alleges that these sales were made pursuant to the alleged 1999 agreement between the parties and that, pursuant to that alleged agreement, Power-Tek and Techlink split the proceeds evenly from these sales. Techlink, on the other hand, denies the existence of any such agreement and insists that it merely hired Power-Tek "to provide support services" in connection with these sales and paid it a negotiated fee. Notably, none of the receipts, invoices or orders that

documented these sales references an even split of the proceeds between Power-Tek and Techlink or any agreement to that effect.

In early 2002, a company called First Energy Corporation contacted Techlink about purchasing a nuclear reactor head, and Techlink suggested that First Energy purchase the reactor head from the Midland facility. First Energy officials visited the Midland facility on one or more occasions and Bischof assisted with these visits. Kemp testified that he offered to pay Bischof for his assistance but that Bischof declined the offer and instead asked to be offered future work.

As negotiations with First Energy and other prospective buyers of the reactor head continued, Consumers Energy and Techlink entered into a March 18, 2002, "Sales & Marketing Agreement," pursuant to which Techlink was to be paid a commission on the final sale price of the reactor head. Neither Power-Tek nor Bischof was a party to this agreement and neither participated in negotiations concerning it. On May 22, 2002, Consumers Energy, First Energy and a broker entered into a "Sales Agreement" providing for the sale of the reactor head for $10,428,000. The Sales Agreement acknowledged that Consumers Energy had "contracted for certain marketing services with Techlink, Inc., and [Consumers Energy] will pay to Techlink, Inc. any fees that [Consumers Energy] has agreed to pay Techlink, Inc., in connection with the sale of the Vessel Head hereunder." Based upon the commission schedule in the Sales & Marketing Agreement, Techlink received a commission of $3,128,000 on the reactor head sale.

Kemp testified that because First Energy used its own contractors to remove the reactor head from the Midland facility, Techlink was unable to hire Power-Tek to perform any support services in connection with that particular sale. Kemp asked Bischof to meet him in Tennessee for a meeting on June 7, 2002, which Bischof did. At that meeting, Kemp explained that Techlink could not offer Power-Tek any additional work on the sale of the nuclear reactor head, but offered to pay Power-Tek $300,000 for the work that it had already performed. Bischof rejected that offer and insisted that he deserved more in light of the alleged 1999 even-split agreement between Power-Tek and Techlink. Kemp denied the existence of any such agreement. According to Kemp, Bischof then asked for a million dollars and, after Kemp refused to pay that amount, threatened that Pitsch would cancel Techlink's Sales & Marketing Agreement with Consumers Energy. In late July 2002, Power-Tek sent Techlink an invoice for $1.56 million. Techlink responded by sending Power-Tek a purchase order for $300,000 for services rendered by Power-Tek. Power-Tek rejected Techlink's purchase order and Techlink eventually revoked it.

Power-Tek filed the instant lawsuit against Techlink on October 15, 2002, alleging claims for breach of contract, promissory estoppel, conversion and breach of the duty of good faith and fair dealing, as well as a third-party beneficiary claim. The crux of Power-Tek's breach-of-contract claim is that Techlink breached the alleged 1999 agreement by failing to pay Power-Tek one-half of the net proceeds that it earned from the sale of the nuclear reactor head to First Energy. Techlink filed an answer that, among other things, denied the existence of any even-split agreement between Power-Tek and Techlink. All parties consented to the exercise of jurisdiction by a magistrate judge over all proceedings, including trial and entry of final judgment.

After discovery, Techlink filed a motion for summary judgment on all claims. The magistrate judge, applying Michigan law, denied Techlink's motion as to the breach-of-contract and promissory-estoppel claims, but granted it as to the remaining claims. A jury trial commenced on April 21, 2003, with respect to the breach-of-contract and promissory-estoppel claims. At the close of Power-Tek's case, Techlink moved for judgment as a matter of law on both claims. The district court granted the motion as to the breach-of-contract claim only. The jury trial on the promissory-estoppel claim continued, with the jury eventually deadlocking. The second trial on the promissory-estoppel claim resulted in a unanimous jury verdict in favor of Techlink.

In this timely appeal, Power-Tek challenges solely the magistrate judge's entry of judgment as a matter of law in favor of Techlink on the breach-of-contract claim.

## II.

### A.  *Choice of Law*

As an initial matter, Power-Tek argues that the magistrate judge erred in holding that Michigan law, rather than Ohio or Tennessee law, governed its adjudication of the breach-of-contract claim.  We review a district court's choice-of-law determination *de novo*. *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).

The parties agree that the choice-of-law principles of Ohio, the forum state, guide our analysis.  Ohio courts follow the Restatement (Second) of the Law of Conflicts, *Ohayon v. Safeco Ins. Co. of Ill.,* 747 N.E.2d 206, 209 (Ohio 2001), which provides that the rights and duties of the parties are determined by the laws of the state with "the most significant relationship to the transaction and the parties," Restatement (Second) of the Law of Conflicts § 188(1).  According to section 188(2) of the Restatement, the following factors are relevant to the determination of which state has the most significant relationship to the transaction and the parties: (a) the place of contracting; (b) the place of contract negotiation; (c) the place of performance; (d) the location of the contract's subject matter; and (e) the parties' respective domiciles, residences, nationalities, places of incorporation and places of business.

With respect to the first factor, the place of contracting, the record is silent as to where the parties were physically located when the alleged 1999 agreement, which Power-Tek alleged was breached, was formed.  While Bischof's own testimony establishes that the alleged 1996 agreement was formed at the Midland facility in Michigan, that is not the agreement that Power-Tek alleges was breached.  Therefore, this factor does not aid significantly in the analysis.

Similarly, the record does not indicate where the parties were located when the alleged 1999 agreement was negotiated.  Nevertheless, the alleged 1999 agreement merely "reaffirm[ed]" the alleged 1996 agreement (the sole change being the substitution of Power-Tek for Bischof), and it is undisputed that the terms of the alleged 1996 agreement were negotiated at the Midland facility in Michigan.  Therefore, it is our view that the second factor weighs in favor of applying Michigan law.

The third factor, the place of performance, is largely unhelpful in this case.  Power-Tek argues that the performance of the alleged 1999 agreement took place in Ohio and Tennessee.  According to Power-Tek, the marketing of the nuclear equipment took place in these states, Techlink received its proceeds from the two prior sales in Tennessee and Power-Tek's share of the proceeds was remitted to Ohio.  On the other hand, it is undisputed that Bischof's contractual obligations, including arranging for and attending site visits, were performed at the Midland facility in Michigan.  At best, then, Power-Tek has established that Ohio, Tennessee and Michigan each have some relationship to the place of performance.

The fourth factor involves the location of the subject matter of the contract.  Power-Tek contends that the subject matter of the alleged 1999 agreement consisted of the net proceeds of any sale of nuclear equipment from the Midland facility.  Those proceeds, it maintains, were located in Tennessee, where Techlink received the money after payment, and then in Ohio, where Power-Tek received payments from Techlink.  Techlink, on the other hand, asserts that the subject matter of the alleged 1999 agreement was the nuclear equipment to be sold, which was located at the Midland facility in Michigan.  The Restatement commentary supports Techlink's position.  Comment e to section 188 of the Restatement provides as follows:

> When the contract deals with a specific physical thing, such as land or a chattel, . . . the location of the thing . . . is significant. . . . The state where the thing . . . is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing . . . as important. Indeed, when the thing . . . is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing . . . was located would be applied to determine many of the issues arising under the contract.

(Internal citation omitted). Because the alleged 1999 agreement involved a chattel that was located in Michigan—*i.e.*, nuclear equipment located at the Midland facility—this factor weighs in favor of applying Michigan law.

Finally, the fifth factor points to both Tennessee and Ohio, as Techlink is a Tennessee corporation and Power-Tek appears to have its principal place of business in Ohio.

Thus, two of the three applicable factors weigh in favor of applying Michigan law and the other factor points to both Ohio and Tennessee law. After weighing these factors, we believe that the magistrate judge correctly concluded that Michigan has "the most significant relationship to the transaction and the parties" involved in Power-Tek's breach-of-contract claim. Restatement (Second) of the Law of Conflicts § 188(1).

## B. *Judgment as a Matter of Law*

Power-Tek's second argument is that the magistrate judge erred in granting Techlink's motion for judgment as a matter of law on Power-Tek's breach-of-contract claim. In reviewing the entry of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, we apply the same standard as the district court. *Sawchik v. E.I. du Pont de Nemours & Co.*, 783 F.2d 635, 636 (6th Cir. 1986). "Thus, we must ascertain whether the evidence is such, without weighing the credibility of the witnesses or considering the weight of the evidence, that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made. Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant [the] motion . . . ." *Lewis v. City of Irvine, Ky.*, 899 F.2d 451, 454-55 (6th Cir. 1990) (citations and quotation marks omitted).

The reason for Power-Tek's vehement opposition to the application of Michigan law is section 566.1 of the Michigan Compiled Laws, upon which the magistrate judge relied in granting Techlink's motion for judgment as a matter of law. Section 566.1 provides as follows:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property shall not be invalid because of the absence of consideration: *Provided, That the agreement changing, modifying, or discharging such contract*, obligation, lease, mortgage or security interest *shall not be valid or binding unless it shall be in writing and signed by the party against whom it is sought to enforce the change, modification, or discharge*.

(Emphasis added.) Michigan courts have universally interpreted section 566.1 as rendering invalid any alleged agreement changing, modifying or discharging a contract where that alleged agreement is neither reduced to writing nor supported by additional consideration. *See, e.g.*, *Mich. Nat'l Bank of Detroit v. Holland-Dozier-Holland-Sound Studios*, 250 N.W.2d 532, 534 (Mich. Ct. App. 1974) (holding that under section 566.1 "a modification to be valid must either be supported by consideration or be in writing").

In granting Techlink's motion for judgment as a matter of law, the magistrate judge held that the alleged 1999 agreement between Power-Tek and Techlink, which Power-Tek claims was breached, was invalid under section 566.1 because that agreement changed, modified or discharged the alleged 1996 agreement by substituting Power-Tek for Bischof, but was neither in writing nor supported by consideration.  We agree.

The alleged 1999 substitution of Power-Tek for Bischof can best be described as a "novation" of the alleged 1996 agreement.  "A novation substitutes a new party and discharges one of the original parties to a contract by agreement of all parties."  Black's Law Dictionary 1064 (6th ed. 1990); *see also* Restatement (Second) of Contracts § 280 (defining a "novation" as "a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty").  This is precisely what Power-Tek alleges was accomplished by the 1999 agreement—the parties' substantive rights and obligations as set forth in the 1996 agreement remained the same, with the only change being the substitution of Power-Tek for Bischof.

Although no Michigan court has specifically opined as to whether a novation constitutes a "change, modification, or discharge" of a contract within the meaning of section 566.1, we are confident that a Michigan court would hold that it does.  The Michigan Court of Appeals has stated that "[a] novation is a *modification* to a contract."  *Hauler v. Parkland Devel. of W. Mich., Inc.*, No. 240753, 2003 WL 21978747, at *3 (Mich. Ct. App. Aug. 19, 2003) (emphasis added).  Additionally, comment b of Restatement section 280 indicates that "[a] novation *discharges* the original duty," typically by "simply substitut[ing] a new obligor for an old obligor."  (Emphasis added.)  Therefore, we hold that, assuming that the alleged 1996 agreement existed in the first place, the alleged 1999 substitution of Power-Tek for Bischof constitutes a change, modification or discharge of the 1996 agreement within the meaning of section 566.1, such that the alleged 1999 agreement is invalid unless it was either in writing and signed by Techlink or supported by consideration.

Power-Tek first argues that sufficient "writings" exist to satisfy section 566.1's requirement that the alleged 1999 agreement be in writing and signed by Techlink.  Such writings, according to Power-Tek, consist of checks, invoices and purchase orders evidencing the alleged 1999 agreement.  The Michigan Supreme Court has held that "a memorandum disclosing merely that a contract has been made, without showing what the contract is, is not sufficient to satisfy the requirement of the statute of frauds that there be a memorandum in writing of the contract."  *Commercial Factors Corp. v. Zephyr Awning Corp.*, 91 N.W.2d 511, 514 (Mich. 1958).  Rather, the court observed, a "memorandum . . . must contain the essential terms of the contract, expressed with such certainty that they may be understood from the memorandum itself . . . ."  *Id.*  The documents relied upon by Power-Tek fail to set forth the essential terms of the alleged 1999 agreement and, in fact, say absolutely nothing about an agreement to split evenly the proceeds of any sales of Midland nuclear equipment.  Therefore, contrary to Power-Tek's assertion, these documents are insufficient to satisfy the statute's writing requirement.

Power-Tek next claims that section 566.1 has been satisfied because the alleged 1999 substitution of Power-Tek for Bischof was supported by consideration.  According to Power-Tek, the consideration for the 1999 substitution was that Power-Tek turned down Consumers Energy's alleged offer for Power-Tek to have exclusive authority to market the Midland equipment in favor of including Techlink in the deal and, relatedly, that it agreed to split the proceeds of any sales of Midland equipment with Techlink instead of keeping all the proceeds for itself.  The record contains no evidence, however, that Consumers Energy ever offered Power-Tek an exclusive contract to market Midland assets.  At best, the evidence indicates merely that Bischof and Pitsch contemplated or discussed such an arrangement.  Moreover, even if Consumers Energy had made that offer to Power-Tek, there is no evidence that Power-Tek's alleged rejection of that offer served as consideration for the alleged 1999 agreement; in fact, Bischof testified that he rejected Consumers

Energy's offer because of his preexisting *1996 agreement* with Techlink. Therefore, it is our view that the alleged 1999 agreement was not supported by consideration.

In summary, we hold that the 1999 alleged agreement is invalid under section 566.1 because it is an "agreement changing, modifying, or discharging" the alleged 1996 agreement, but is neither in writing and signed by Techlink nor supported by consideration. Accordingly, the magistrate judge correctly granted Techlink's motion for judgment as a matter of law on Power-Tek's breach-of-contract claim.

## III.

For these reasons, the district court's judgment is AFFIRMED.