NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0322n.06

Case No. 15-3568

FILED
Jun 14, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MISC BERHAD,                                    )
                                               )
        Plaintiff-Appellant,                   )
                                               )    ON APPEAL FROM THE UNITED
v.                                             )    STATES DISTRICT COURT FOR
                                               )    THE NORTHERN DISTRICT OF
ADVANCED POLYMER COATINGS, INC.,               )    OHIO
et al.,                                        )
                                               )
        Defendants-Appellees.                  )
                                               )

BEFORE: BOGGS and DONALD, Circuit Judges; and HOOD, District Judge.*

**I.**

HOOD, District Judge. This case involves a dispute over the delamination of the protective coating of ocean-going chemical tankers. Plaintiff-Appellant, MISC Berhad ("MISC"), is an international shipping corporation that contracted with a shipyard to build chemical tanker ships and cargo tanks. The shipyard hired Defendant-Appellee, Advanced Polymer Coatings, Inc. ("APC"), as a subcontractor to supply and apply an epoxy protective coating called "MarineLine" to the tankers and cargo tanks. The MarineLine coating delaminated on several of MISC's tanks, which resulted in a dispute as to who was responsible for repairing the tanks and bearing the cost of the repairs. MISC appeals from the summary judgment entered in favor of APC as to MISC's claims for breach of express warranty as to the

*The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Insurance Guarantees, breach of express warranty as to the Certificate of Completion, and negligent misrepresentation. For the reasons that follow, we affirm the decision of the district court.

## I.

MISC is an international shipping company based in Malaysia that owns and operates chemical tankers. [DE 44-2, ¶6, Page ID 891]. In late 2006 or early 2007, MISC entered into a shipbuilding contract with a shipyard, SLS Shipbuilding Co., Ltd. ("SLS"), for the construction and sale of several ocean-going chemical tanker vessels,[1] including the Bunga Bakawali ("Bakawali") and the Bunga Balsam ("Balsam") (the "SLS/MISC Contract"). *Id*. at ¶8; DE 44-2, ¶8; Page ID 891. The Bakawali and Balsam tankers transport oils and liquid chemicals in shipboard cargo tanks around the world. [DE 44-2, ¶ 9; Page ID 891]. Ocean-going tankers such as the Bakawali and Balsam are subject to the International Code for the Construction and Equipment of Ships Carrying Dangerous Chemicals in Bulk ("IBC Code"), which requires that chemical tankers be coated in protective material that can shield the steel substrate of cargo tanks from corrosion caused by chemicals transported in the vessels. [DE 40-11, ¶¶15-17; Page ID 655-56].

APC developed a product called "MarineLine," which is an approved and patented protective coating for chemical tankers. [DE 40-11, ¶¶17-18, Page ID 656; DE 40-14, ¶¶ 8-16, Page ID 689]. To assure that tanker operators can observe any corrosion of the coating before the transported chemicals begin to corrode the steel substrate of the cargo tanks, APC developed a two-layer application process in which the base coat is painted red and the top coat gray. [DE 40-14, ¶10-11, Page ID 689]. If MarineLine is chemically attacked, the top coat dissolves,

---

[1] According to an affidavit provided by MISC, the contract was entered into in 2007. [DE 44-2, ¶8, Page ID 891]. APC, who was not a party to the contract, offers an unsigned copy of the contract, which is dated November 28, 2006. [DE 40-1; Page ID 605].

exposing the red base coat. *Id.* APC manufactures and sells its MarineLine product to shipyards that build or renovate chemical tankers. *Id.* at ¶16, Page ID 689.

APC marketed MarineLine to MISC, and MISC chose MarineLine based on APC's representations that MarineLine was superior to other coating products and resistant to a broad spectrum of cargoes, including the liquid cargoes that MISC's vessels would carry. [DE 44-2, ¶14-16; Page ID 892]. At the direction of MISC, on August 18, 2009, SLS entered into a contract with APC to coat a number of tankers with MarineLine, including the Bakawali and Balsam tankers (hereinafter the "SLS/APC Contract"). [DE 44-2, ¶17, Page ID 892; DE 40-12, Page ID 659-70]. Pursuant to the SLS/APC Contract, SLS was responsible for providing the surface preparation for the work and maintaining the environment for application of the coating. *Id.* This included providing the specified dehumidification and heating equipment and maintaining the temperature of the area in which the coating was applied. *Id.* APC, on the other hand, was responsible for supplying and applying MarineLine, which included heat curing the coating. [DE 40-12, Page ID 659-70]. APC was also responsible for inspection and testing services during each part of the application process to ensure that the coating was properly applied, while SLS and MISC were required to have a representative present during the inspections. *Id.* at ¶ 2(3), Page ID 663; ¶19, Page ID 669. APC's inspectors were instructed to write up any deviations from APC specifications in a corrective-action report and obtain a signature of the party responsible for meeting the specification. [DE 40-2 ¶24, Page ID 630]. Upon a satisfactory inspection at completion of the work, SLS was to provide a Certificate of Completion to APC. *Id.*

Coating of the Bakawali commenced during December of 2009 and continued through January of 2010. [DE 40-2 ¶27, Page ID 631]. During the application process, the APC

3

inspector observed that SLS was not meeting the standard heating procedures for MarineLine application in the Bakawali, which led to four corrective-action reports being prepared by APC. *Id*. at ¶¶ 29-32. The reports, dated January 8, 9, 10, and 12, 2010, detail the observations of the inspector (carbon soot on various portions of the tanks), the non-conformance (improper heating equipment), the corrective action (a list of the type of proper heating equipment to be used in the future), and a disclaimer of any damages caused by SLS's non-conformance. [DE 40-5-8, Page ID 642-646]. Each corrective-action report was signed by SLS and MISC. *Id*. The Bakawali tanks were heat cured during the last week of January of 2010 with final testing and inspection occurring thereafter. [DE 40-2, ¶¶33-35, Page ID 631]. On February 1, 2010, APC issued an Insurance Guarantee to SLS for the Bakawali. [DE 40-2, ¶35, Page ID 631; 44-2, Page ID 904-910]. The Bakawali Insurance Guarantee included an addendum that excluded the tanks that were subject to the January 8, 9, 10, and 12, 2010 corrective-action reports. *Id.* On March 7, 2010, SLS issued a Completion Certificate for the Bakawali, certifying that the tanks had been coated and cured with MarineLine coating per APC's specifications and were ready for service, which was signed by APC, MISC, and SLS. [DE 40-2, ¶34, Page ID 631; 44-2, Page ID 902]. On or about October 5, 2010, SLS assigned the Bakawali Insurance Guarantee to MISC. [DE 40-2, ¶ 42; Page ID 632].

On June 4, 2010, following the Bakawali's first voyage, during which it was carrying vegetable oil, MISC discovered delamination defects, discoloration, and other indications of failure of MarineLine in the cargo tanks of the Bakawali. [DE 44-2, ¶30-31, Page ID 893; DE 46-1, Page ID 1013]. On June 6, 2010, MISC notified SLS and APC of the problem. [DE 44-2, ¶ 31; Page ID 893]. Delamination, which describes the condition where the top coat fails to bond to the base coat, can result from a number of factors that interfere with the bond between

4

the top and bottom coat. [DE 40-11, ¶¶ 37-38; Page ID 658]. One recognized factor that can lead to delamination is the formation of carbamates on the base coat before the second coat is applied. *Id.* A laboratory analysis of coating chips from the Bakawali's delaminating tanks revealed the presence of carbamates between the top coat and the base coat on the samples, which APC concluded to be the cause of delamination. [DE 40-17, PageID 704-708].

Coating and heat curing of the Balsam occurred during February and March of 2010.[2] [DE 40-2, ¶36; Page ID 632-33]. On May 13, 2010, SLS issued a Certificate of Completion for the Balsam, which was signed by SLS, APC, and MISC. *Id.* at ¶ 38; DE 44-2 at 15, Page ID 903. APC also issued an Insurance Guarantee to SLS covering the Balsam, which terms appear identical to the Insurance Guarantee issued for the Bakawali, and which was subsequently assigned to MISC. [DE 44-2, Page ID 911-915; DE 40-2, ¶¶42-43, Page ID 632]. Despite the issuance of the Certificate of Completion, APC and MISC were concerned about the quality of the application of MarineLine to the Balsam. [DE 40-14, Page ID 688-695; DE 44-2, ¶ 38, Page ID 894]. For this reason, additional "pull tests" were conducted on the Balsam tanks. [DE 44-2, ¶ 39-40, Page ID 894; DE 40-14, ¶ 26-38, Page ID 691-92]. Pull tests measure the adhesive strength of the bond between the base coat of MarineLine and the metal substrate and the bond between the base coat and the top coat. [DE 40-14, ¶ 28, Page ID 691]. The test panels passed the in-house laboratory pull tests conducted by APC. [DE 40-16, Page ID 700-703]. However, in-field pull tests on the top of tank 6P on the Balsam revealed a weak bond strength of MarineLine in the tank top coating, and further testing by APC confirmed the presence of carbamates on the surface of the base coat, which APC believes prevented full bonding between

---

[2] There is no record in the inspection reports for the Balsam as to whether the temperature in the tanks was maintained during application and, if so, what type of heat was used. *Id.*

the base coat and top coat. *Id*. at ¶26-35; DE 40-18; DE 40-14, ¶32, Page ID 692; DE 40-15, Page ID 698-703.

APC urged MISC not to accept delivery of the Balsam without SLS agreeing to make the repairs. [DE 40-19, Page ID 732]. At this point, a dispute arose as to who was responsible for making, and bearing the expense of, repairs to the Bakawali and Balsam. Despite MISC and APC's attempts to persuade SLS to pay for the repairs, SLS refused, and, ultimately, MISC accepted delivery of the Balsam without the repairs. [DE 41, Page ID 739-740; DE 40-20, Page ID 735]. MISC transported the Bakawali and Balsam to China to be recoated by a shipyard there. [DE 44-2, Page ID 890-96]. The Bakawali was recoated in September of 2010, and the Balsam was recoated in September of 2011. [DE 44-2, Page ID 894].

APC provided MarineLine and heat curing services for the repairs at no charge. [DE 40-14, ¶¶ 50, 54; Page ID 693-94; DE 40-2, Page ID 633]. APC also offered MISC a reduced price for MarineLine on other vessels for the following years, which offer MISC accepted. [DE 40-2, ¶ 49, Page ID 633]. MISC presented APC with an invoice for the recoating costs, which APC refused to pay. [DE 40-14, ¶ 51, Page ID 694; DE 40-21, Page ID 737-38]. APC's position is that SLS failed to maintain the environment in which the tanks were coated, which caused the delamination to occur, and that it was SLS's responsibility to remove the compromised coating and reapply MarineLine pursuant to the SLS/MISC Contract. [DE 40-14, ¶39-59; Page ID 692-95]. MISC maintains that the repair costs should be covered by APC pursuant to the Insurance Guarantees.

The parties discussed settlement on numerous occasions via written correspondence, and in June and December of 2010, MISC and APC met to discuss a resolution of the dispute. [DE 35-7-9; Page ID 542-551]. At those meetings, APC informed MISC that it would "check with its

insurance provider" regarding the issue.[3]  *Id.*  The Insurance Guarantees were not underwritten by a third-party insurer, which MISC did not learn until December of 2013.  [DE 44-2, Page ID 904; DE 24-2, Page ID 289; DE 24-1, Page ID 276-77; DE 46-1, Page ID 1013-15].

This suit followed the parties' unsuccessful settlement discussions.  The parties filed cross-motions for summary judgment.  The district court granted APC's motion and denied MISC's motion.  MISC timely appealed the district court's decision to deny MISC's motion for summary judgment and to grant APC's motion for summary judgment as to MISC's claims for breach of warranty and negligent misrepresentation.

## II.

We review a district court's grant of summary judgment *de novo*.  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010)(citation omitted).  A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The critical question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,*  477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  When ruling on a summary-judgment motion, a court must draw all reasonable inferences from the evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

[3] The district court granted APC's motion for summary judgment on MISC's claim of negligent misrepresentation based on APC's statements regarding a third-party insurance carrier, and MISC has not appealed this part of the district court's decision.  Nevertheless, statements by APC regarding insurance are relevant to MISC's equitable estoppel claim, and, thus, discussed *infra*.

**III.**

First, MISC appeals the district court's decision to grant APC's motion for summary judgment on MISC's breach-of-warranty claim as to the Insurance Guarantees. For the reasons stated below, we affirm the district court's grant of summary judgment in favor of APC as to this claim.

MISC argues that because the SLS/APC Contract required APC to guarantee the performance of its MarineLine product, the Insurance Guarantees and the SLS/APC Contract are interrelated and should be read together. When read together, MISC argues that the documents show that it was the parties' intention to broadly guarantee all claims related to the performance of MarineLine for a period of five years. Based on this reading, MISC maintains that it need not prove corrosive or chemical attack as provided by § 2.03 of the Insurance Guarantees, and that the district court's finding should be reversed because the facts are undisputed that the Bakawali and Balsam coatings failed.[4]

Although the Insurance Guarantees contain a New York choice-of-law provision, the district court applied Ohio law in analyzing MISC's claim that APC breached an express warranty. For whatever reason, APC now argues that New York law controls. We typically review a district court's choice-of-law analysis de novo. *See Power-Tek Solutions Servs., LLC v. Tech/ink, Inc.,* 403 F.3d 353, 354 (6th Cir. 2005). In this case, however, the district court did not conduct choice-of-law analysis nor did the parties contest its application of Ohio law. Since neither party raised choice-of-law arguments below, they may not do so on appeal. *See Meridia Prods. Liab. Litig. v. Abbott Labs.,* 447 F.3d 861, 865 (6th Cir. 2006); *Michigan Chem. Corp. v.*

---

[4] There is no dispute that the coating of portions of the Bakawali and Balsam vessels failed, and the record demonstrates that the coating failure was caused by the presence of carbamates upon the surface of the base coat which prevented the top coat from bonding completely. [DE 40-18; DE 40-14, ¶32, Page ID 692; DE 40-15, Page ID 698-703; DE 40-17, PageID 704-708]. There is no evidence in the record that the coatings failed as a result of corrosive or chemical attack.

*Am. Home Assur. Co.,* 728 F.2d 374, 377 (6th Cir. 1984); *see also All Williams v. BASF Catalysts LLC,* 765 F.3d 306, 316 (3d Cir. 2014) ("All U.S. Courts of Appeals to have addressed the issue have held that choice-of-law issues may be waived.").

MISC views the Insurance Guarantees and SLS/APC Contract as part and parcel of the same agreement. By its logic, language from the contract that is favorable to its claim should be imputed to the guarantees that it was assigned. We see things differently. Of course a contract may consist of multiple writings. *See Restatement (Second) of Contracts* § 209 (1981); *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth..,* 678 N.E.2d 519, 526 (Ohio 1997). But "[a] contract that appears to be a complete and unambiguous statement of the parties' contractual intent is presumed to be an integrated writing." *Bellman v. Am. Int'l Grp.,* 865 N.E.2d 853, 857 (Ohio 2007).

Each Insurance Guarantee was an integrated writing. The SLS/APC Contract was executed on August 18, 2009. It supplies the terms and conditions pursuant to which APC was to provide and apply MarineLine to SLS's ships. Although MISC may have asked SLS to hire APC, MISC is not a party to their agreement nor mentioned in it. The Insurance Guarantees were executed on February 1, 2010 and May 13, 2010, respectively. APC issued them to SLS, who transferred them to MISC along with the ships. Subject to conditions, they guarantee the performance of MarineLine for five years. MISC has introduced no evidence demonstrating that the contract was not an integrated writing executable without reference to the later-issued guarantees. Rather, the record reflects the opposite. The contract's merger clause states that "[t]he writing represents the final express[ion] of the parties agreement." APC performed its obligations under the SLS/APC Contract before the Insurance Guarantees were executed. For these reasons, we find that the agreements cannot be read together.

Reading the Insurance Guarantees as distinct, integrated writings, the next question is whether their meaning is unambiguous. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis,* 797 N.E.2d 1256, 1261 (Ohio 2003). Ohio courts presume that the language of a contract reflects the parties' intent and look to its plain and ordinary meaning unless another is clearly apparent. *Ibid.*

The key provisions of the Insurance Guarantees[5] state:

> 2.01 Insurance company will reimburse the Customer for the cost of replacement MarineLine Coating materials and their application, as may be necessary to repair Defective Areas in accordance with this Guarantee, providing that such repairs are actually carried out and that Advanced Polymer Coatings, Ltd. entire liability under this Guarantee shall be limited to the initial costs which are Replacement of MarineLine coating material, inspection, Staging/Surface Preparation, Application, and Heat Curing.
>
> 2.02 Insurance guarantee will meet the costs of repairing the Defective Areas covered by the terms of this Guarantee as follows:
>
> Defects detected the:
>
> | | |
> |---|---|
> | First | 12 months of the guarantee period - 100% of total cost |
> | Second | 12 months of the guarantee period - 100% of total cost |
> | Third | 12 months of the guarantee period - 100% of total cost |
> | Fourth | 12 months of the guarantee period - 100% of total cost |
> | Fifth | 12 months of the guarantee period - 100% of total cost |
>
> 2.03 For the purpose of this Guarantee, deductible means that this guarantee only becomes effective if more than the deductible area per tank shows any break in the integrity of the coating material (including cracking) due to the corrosive attack of the coating resulting in the steel substrate to a severity greater than Re-2.
>
> Deductible applies each year when exceeding:
>
> | | | |
> |---|---|---|
> | First | 12 months of the guarantee period- | 3% |
> | Second | 12 months of the guarantee period- | 3% |
> | Third | 12 months of the guarantee period- | 3% |
> | Fourth | 12 months of the guarantee period- | 3% |
> | Fifth | 12 months of the guarantee period- | 3% |

---

[5] The Insurance Guarantees for the Bakawali and Balsam tanks are identical, and, therefore, analyzed together.

Although making sense of the guarantees requires parsing a bit of technical jargon, we find their meaning unambiguous. The guarantees assign a unique meaning to "deductible": it "means that this guarantee *only becomes effective if* more than the deductible area per tank shows a break in the integrity of the coating due to corrosive attack resulting in the steel substrate to a severity greater than Re-2." Since the parties' unusual definition "is clearly intended from the face ... of the instrument," we apply it in place of the word's ordinary meaning. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). The next sentence instructs that the "[d]eductible applies" for the next five years if it exceeds three percent. Given the parties' definition of "deductible," this can have only one meaning - more than three percent of each tank's coating must show damage due to corrosion before the warranty takes effect.

For the above reasons, we find that the district court properly interpreted the Insurance Guarantees as stand-alone agreements and that MISC failed to present a genuine issue of material fact that APC breached the express warranties in the Insurance Guarantees. Therefore, we affirm the district court's decision to grant APC's motion for summary judgment on MISC's breach-of-warranty claim as to the Insurance Guarantees.

Second, MISC appeals the district court's decision to grant APC's motion for summary judgment on MISC's breach-of-warranty claim as to the Completion Certificates. Although MISC does not dispute that the district court properly applied Ohio's four-year statute of limitations to its claim,[6] MISC appeals on the basis that the district court erred by not finding that APC was equitably estopped from raising a statute-of-limitations defense.[7] Because the district

---

[6] The Completion Certificates were assigned to MISC in March and May of 2010, and as MISC admits, suit was not filed within four years of May of 2010 as required by Ohio Rev. Code § 1302.98.

[7] APC argues that the Completion Certificates are not express warranties in the first place and that there is no privity of contract between MISC and APC. Brief of Appellee at 19-20. As did the district court, we decline to address

11

court properly found that MISC may not rely on equitable estoppel to preclude APC's statute of limitations defense, we affirm the district court's grant of summary judgment as to this claim.

Ohio law governs the application of equitable estoppel to MISC's breach-of-express-warranty claim. *See Walburn v. Lockheed Martin Util. Servs., Inc.,* 443 F. App'x 43, 47 (6th Cir. 2011); *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). "Under Ohio law, the doctrine of equitable estoppel precludes a defendant from using the statute of limitations as a defense when the defendant's conduct induced the delay in filing the action." *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 2d 490, 510 (S.D. Ohio 2012) (quoting *JRC Holdings, Inc. v. Samsel Servs. Co.,* 850 N.E.2d 773 (Ohio Ct. App. 2006)). To invoke the doctrine of equitable estoppel, a plaintiff must show: "(1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) that it induces actual reliance that is reasonable and in good faith, and (4) that it causes detriment to the relying party." *Romine v. Ohio State Highway Patrol,* 737 N.E.2d 586, 589-90 (Ohio Ct. App. 2000). The Ohio courts have narrowed the type of misrepresentation required to invoke equitable estoppel in the statute-of-limitations context. *Walburn*, 443 F. App'x 43, 49 (6th Cir. 2011). A plaintiff must plead facts that, if true, demonstrate that the defendant made an affirmative statement that the limitations period was larger than it was, promised a better settlement if the plaintiff did not bring suit, or made similar representations to induce a delay in bringing suit. *Id.* (quoting *Helman v. EPL Prolong, Inc.*, 743 N.E.2d 484, 495 (Ohio Ct. App. 2000)). In other words, "[i]n order to apply the doctrine to the statute of limitations, a party must show that the misrepresentation 'was calculated to induce a plaintiff to forgo the right to sue.'" *Hoeppner v. Jess Howard Elec. Co.*, 780 N.E.2d 290, 297 (Ohio Ct. App. 2002)(quoting

---

these arguments because, regardless, MISC's claim fails as untimely pursuant to the applicable four-year statute of limitations.

*Welfley v. Vrandenburg*, No. 95APE11–1409, 1996 WL 145467, at \*3 (Ohio Ct. App. March 29, 1996)).

MISC claims that the following meeting minutes are evidence of APC's misrepresentations and efforts to forestall suit and representations upon which MISC relied:

> "APC to advise after checking with their insurance company." [DE 43-2, Page ID 857, June 2010 Meeting Minutes].
>
> "It is our intention to resolve this matter to your complete satisfaction and to do so as quickly as possible." [DE 43-2, Page ID 865, August 2010 Meeting Minutes].
>
> APC will discuss the coating issue "with their management and insurance company and will revert within next week." [DE 43-2, Page ID 865, December 2010 Meeting Minutes].
>
> "MISC and APC will separately revisit previous MOM [Memorandum of Meeting] and correspondences and will come up with an amicable solution as soon as possible." [DE 46-1, Page ID 1019, April 2011 Meeting Minutes].
>
> "APC will revert with proposal to resolve the matters amicably" and "[a]s agreed[,] matters will be resolved amicably." [DE 43-2, Page ID 870, December 2013 Meeting Minutes].

Equitable estoppel is a mixed question of law and fact and must be submitted to the jury when an evidentiary dispute exists regarding its application. *JRC Holdings, Inc. v. Samsel Servs. Co.*, 850 N.E.2d 773, 779 (Ohio Ct. App. 2006). Here, there is no dispute that APC represented that it had third-party insurance coverage, which MISC claims led it to believe some or all of its claims for the repairs costs to the Bakawali and Balsam would be covered by the insurance. DE 44-2 at 6-7, Page ID 895-896; DE 43-2, Page ID 857, 865, 870]. Although the district court did not address whether this type of representation is the type required to establish equitable estoppel in the statute of limitations context, we find that it is not. There is no evidence that APC misrepresented or even discussed the length of the limitations period, promised a better settlement if the MISC did not bring suit, or made any type of similar representation.

As to reliance, we agree with the district court that whether or not an insurance company existed or not has no bearing on the decision to file a timely claim. Even if APC did in fact have third-party insurance, the Ohio direct action statute requires an injured person to first obtain judgment against the insurer. Ohio Rev. Code § 3929.06(B). Thus, MISC was required to first obtain judgment against APC, which required suit against APC within the statute-of-limitations period. And even in the absence of the direct action requirement of § 3929.06(B), an insurance company stands in the shoes of the claimant, and likewise, the claim would have had to have been filed against the insurance company within the four-year statute-of-limitations period. [DE 50 at 17, Page ID 1102].

In numerous cases, Ohio courts have declined to apply estoppel to a statute of limitations defense in the context of an insurer's settlement negotiations with an insured based on lack of reasonable reliance by the insured. *See e.g., Lottridge v. Gahanna-Creekside Invests., L.L.C.*, 36 N.E.3d 744 (Ohio Ct. App. 2015)(rejecting equitable-estoppel argument when defendants consistently denied liability and never offered to settle plaintiff's claim if she would forgo suit). *Burgio v. Allstate Insurance Co.*, No. 84254, 2005 WL 272999 (Ohio Ct. App. February 3, 2005)(the insured's claim of estoppel failed where the record was devoid of any evidence that the insurer admitted liability, held out a reasonable hope of adjustment, took any action to delay plaintiff in filing the action, or made statements regarding the limitation period); *Minnick v. Lee*, No. L-98-1221, 1999 WL 63663 (Ohio Ct. App. Feb. 12, 1999)(insurer's repeated requests for medical documents, the payment of a property-damage claim, engaging in settlement negotiations, and a promise to pay medical expenses if agreement could be reached are not sufficient reasons to allow a plaintiff to untimely commence suit); *Payton v. Rehberg*, 694 N.E.2d 1379 (Ohio Ct. App. 1997)(plaintiff not justified in reasonably relying on

14

representations that defendants would be willing to negotiate settlement once plaintiff's medical bills were received); *Tabler v. Miller*, No. 89CA27, 1990 WL 193594 (Ohio Ct. App. Dec. 4, 1990)(insured's claim of estoppel failed where there was no evidence that the insurer induced him to believe that the policy period would not apply to their negotiations). In the cases cited by MISC, the Ohio courts similarly rejected the plaintiff's equitable-estoppel arguments in the absence of evidence of reliance on a factual misrepresentation as to the statute of limitations. *See Young v. Leslie*, No. 08CA0015, 2009 WL 224504 (Ohio Ct. App. Feb. 2, 2009)(insurer's willingness to mediate the case while the insured had a viable claim does not equate to a waiver of statute of limitations, especially absent a factual misrepresentation as to the statute of limitations); *Schrader v. Gillette*, 549 N.E.2d 218, 220-21 (Ohio Ct. App. 1988)("the record shows that appellant failed to proffer any evidence showing actual reliance upon appellee's statement" that "his insurance company would contact [appellant] about the situation").[8]

Construing the evidence most strongly in favor of appellant, we hold that although one can conclude that APC and MISC engaged in substantial settlement discussions regarding repairs to the Bakawali and Balsam, which included statements by APC that it would confer with its insurance carrier, MISC could not have reasonably and justifiably relied on these statements to delay filing this action until the limitation period had lapsed. There is no evidence in the record of discussions regarding the statute of limitations. There is also no evidence in the record that APC accepted liability for the coating failure. Rather, since 2011, APC consistently maintained that SLS was contractually obligated to bear the repair costs. DE 40-20, Page ID 733-735; DE

---

[8] In *City of Bedford v. James Leffel & Co.*, 558 F.2d 216 (4th Cir. 1977), cited by MISC, the Fourth Circuit vacated the district court's entry of summary judgment finding that there was at least a question whether plaintiff reasonably relied on defendant's words of compromise and settlement. Unlike APC, however, the defendant in that case did not affirmatively refute liability. Moreover, the court was applying Virginia law, which did not, at the time, appear to require affirmative representations as to the statute of limitations period as does Ohio law.

40-21, PageID 737-738; DE 44-2, Page ID 926-935. If MISC believed there was a third-party insurer, it could have filed suit at this time. Finally, we note that the Second Amended Complaint states that MISC retained counsel prior to December 2013 and spent over $15,000 evaluating the best course of action to pursue. The last settlement discussions in the record from December 2013 state in pertinent part:

> MISC demands a total about USD7.55 million by end of December 2013 for SLS and STX MarineLine coating repair claims. APC will revert with proposal to resolve the matters amicably, failing which MISC will opt for legal recourse. … As agreed matters will be resolved amicably.

DE 44-2, Page ID 935. Thus, despite acknowledging in December 2013 that it would seek legal recourse if the matter was not resolved, MISC did not file suit until six months later. With nothing in the record to indicate why MISC should be permitted to reasonably rely on settlement discussions with APC, including statements by APC regarding the existence of insurance, we find that the district court properly rejected MISC's estoppel argument. For this reason, we affirm the district court's decision to grant APC's motion for summary judgment on MISC's breach-of-express-warranty claim as to the Certificates of Completion.

Third, MISC appeals the district court's decision to grant APC's motion for summary judgment on its negligent-misrepresentation claim with respect to the Bakawali Certificate of Completion. The district court held that MISC could not have justifiably relied on the certificate because APC had previously issued corrective-action reports as to certain Bakawali tanks, which reports MISC signed, and because MISC had full knowledge of the coating problems and of the fact that APC had denied liability as to those tanks prior to issuance of the Certificate of

Completion and acceptance of the Bakawali.[9] For the reasons stated below, we affirm the district court's decision.

Ohio law follows the negligent misrepresentation standard set forth in § 552(1) of the Restatement (Second) of Torts, which states in relevant part as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977). *See Haddon View Invest. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 214, n.1 (Ohio 1982); *Long v. Time Ins. Co.*, 572 F. Supp. 2d 907, 912 (S.D. Ohio 2008). Thus, in order to prevail on its negligent-misrepresentation claim, MISC was required to present a genuine issue of material fact as to whether APC exercised reasonable care in obtaining or communicating the information presented in the Certificate of Completion, and there must have been a genuine issue of material fact on whether MISC justifiably relied upon that information.

The heart of MISC's appeal on its negligent-misrepresentation claim relates to the justifiable-reliance element, which formed the basis of the district court's opinion. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Crown Property Dev., Inc. v. Omega Oil Co.,* 681 N.E.2d 1343, 1349 (Ohio Ct. App. 1996). Establishing justifiable reliance does not require a showing that the plaintiff's reliance conformed to what a "reasonable man" would have believed. Rather, a determination regarding justifiable reliance involves a fact-based inquiry into the circumstances of the claim and the relationship

---

[9] The district court also granted summary judgment on MISC's claim of negligent misrepresentation as to the Certificate of Completion on the Balsam but MISC does not appeal that portion of the court's decision.

between the parties. *Davis v. Montenery*, 880 N.E.2d 488, 497 (Ohio Ct. App. 2007). The court must consider the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances.[10] *Hubbard Family Trust v. TNT Land Holdings, LLC*, 9 N.E.3d 411, 422-23 (Ohio Ct. App. 2014). An individual may not rely on misrepresentations when the true facts are equally open to both parties. *Fleck v. Loss Realty Grp.*, 2011 WL 282352, at *3 (Ohio Ct. App. Jan. 14, 2011)(citation omitted).

As to the Bakawali tanks that were included in the corrective-action reports (7P/S, 8P/S, 9P/S, 10P/S, Slop P), we find that the district court properly concluded that MISC could not have justifiably relied on the completion certificates to believe that the tanks were "ready for service" because the reports provided reason to doubt the truth of the representation. The corrective-action reports, dated January 8, 9, 10, and 12, 2010, plainly state that standard heating procedures were not followed during the application of MarineLine to the Bakawali tanks, which resulted in carbon soot on various tanks, with a disclaimer of any damages caused by the shipyard's non-conformance. [DE 40-5-8, Page ID 642-646]. Each corrective-action report was signed by MISC. Therefore, MISC cannot deny that it had knowledge of the problems with respect to the Bakawali tanks included in the corrective-action reports. *Id.*

Once MISC had knowledge of the damaged tanks, MISC had a duty to reasonably investigate before relying on the truth of a representation as to the tanks. *Foust v. Valleybrook Realty Co.*, 446 N.E.2d 1122, 1125 (Ohio Ct. App. 1981); *see also Riccardi v. Levine*, No.

---

[10] MISC argues that the district court erred by weighing evidence of reliance on the representation rather than submitting it to the jury. However, "[c]ourts regularly delve into the facts related to the circumstances of the claim and the relationship between the parties on summary judgment to determine whether a party's reliance was reasonable or justifiable." *Thompson v. TransAm Trucking, Inc.*, No. 2:08-CV-927, 2011 WL 2293281, at *7 (S.D. Ohio June 8, 2011)(summarizing a host of Ohio cases in which the trial court weighed evidence of justifiable reliance on a motion for summary judgment involving a claim of negligent misrepresentation).

76215, 2000 WL 573188, at \*3 (Ohio Ct. App. May 11, 2000)("When a person has the opportunity to investigate, and when the circumstances would cause a person of ordinary care to investigate, and that person fails to do so, the element of justifiable reliance will not be proven."); *Tipton v. Nuzum*, 616 N.E.2d 265, 268-69 (Ohio Ct. App. 1992) ("Once alerted to a possible defect, a purchaser may not simply sit back and then raise his lack of expertise when a problem arises."). Yet, despite knowledge of the non-conforming heat procedures during application and knowledge of APC's disclaimer of any problems resulting therefrom, there is no evidence that MISC requested that any action be taken to correct the problems prior to signing the Completion Certificate on March 7, 2010 and accepting delivery of the Bakawali. Nor is there evidence that MISC performed further investigation itself to determine whether to purchase the Bakawali. Rather, with knowledge of the problems that occurred during application, MISC moved forward with the purchase. Therefore, despite the fact that the Certificate of Completion stated that "all tanks are ready for service," MISC could not have justifiably relied on this statement with respect to the tanks that were subject to the corrective-action reports.

The conclusion that reliance on the Certificate of Completion is not justifiable by MISC is consistent with the holdings of Ohio courts in analogous cases where purchasers of homes have attempted to rely on inspection reports despite knowledge of defects in the home. *See e.g., Fleck,* 2011 WL 282352 (holding that appellant had not proved justifiable reliance and summary judgment was proper where the buyers were aware of water damage in the basement, knew that a nearby creek was prone to flooding, should have known information provided by sellers was incomplete, and should have conducted a more thorough investigation); *Cardi v. Gump,* 698 N.E.2d 1018 (Ohio Ct. App. 1997) (a buyer could not show justifiable reliance on the seller's representations regarding a lack of water leakage since the inspectors made note of water

intrusion issues); *Moore v. Daw*, No, CT 95-20, 1996 WL 488853 (Ohio Ct. App. Aug. 20, 1996)(affirming summary judgment on fraud claim, which also requires proof of justifiable reliance, noting that where plaintiffs had actual knowledge of previous infestation of termites, plaintiffs could not justifiably rely on termite inspection report that indicated there were no termites).

As to the Bakawali tanks that were not included in the corrective-action reports but were later found to have coating failure in June of 2014 (including 2S, 4S and 6P), there is no evidence in the record that APC knew or had reason to know that the coating would fail on the 2S, 4S, and 6P tanks. The Certificate of Completion was issued in March of 2014, with the failures discovered in June of 2014. MISC argues that it was entitled to expect that APC carefully made a final inspection before issuing the Certificate of Completion. However, MISC has presented no evidence that APC's inspector, in the exercise of reasonable care, could have detected the presence of carbamates. APC, on the other hand, provided testimony that there is no field test to detect the presence of carbamates on the surface of the base coat. David Keehan Affidavit R 40-11, Page ID 654-658. Furthermore, the completion certificate was signed by three inspectors, including MISC's representative, none of whom made any indication that they were aware that carbamates had formed between the coats of MarineLine. Therefore, as to all of the damaged Bakawali tanks (including 2S, 4S and 6P, which were not the subject of corrective-action reports), there is no genuine issue of material fact as to whether APC exercised reasonable care in inspecting the tanks before signing the certificate of completion.

Although the district court did not address this argument, on appeal, APC contends that MISC's claim of negligent misrepresentation is also barred by the four-year statute of limitations set forth in Ohio Rev. Code § 2305.09. Under Ohio law, the statute of limitations applicable to

negligent-misrepresentation claims begins to run when the event giving rise to the claim occurs. *Lasmer Ind., Inc. v. AM General, LLC*, 741 F. Supp. 2d 829, 837 (S.D. Ohio 2010); *see also Dancar Props., Ltd. v. O'Leary-Kientz, Inc.*, No. C-030936, 2004 WL 2974067 (Ohio Ct. App. Dec. 23, 2004)("[T]he cause of action accrues when the misrepresentation occurs."). Therefore, the time period for MISC's negligent-misrepresentation claim would have begun to run upon the issuance of the Certificate of Completion, which occurred on March 2, 2010. MISC filed suit on June 3, 2014. Therefore, MISC's negligent-misrepresentation claim was untimely and barred by § 2305.09. As set forth above, MISC may not equitably estop APC's statute-of-limitations defense.

For the reasons stated above, we affirm the district court's decision to grant APC's motion for summary judgment on MISC's negligent-misrepresentation claim. MISC failed to present a genuine issue of material fact as to whether it justifiably relied upon the Certificate of Completion regarding tanks that were the subject of the corrective-action reports and failed to present a genuine issue of material fact as to whether APC exercised reasonable care when inspecting the tanks prior to signing the certificate as to the remaining tanks.[11] The claim is also time barred under the applicable statute of limitations.

## IV. CONCLUSION

For all of the reasons stated above, we **AFFIRM** the district court's grant of APC's motion for summary judgment on MISC's breach-of-warranty claim as to the Insurance Guarantees, breach-of-warranty claim as to the Certificates of Completion, and negligent-misrepresentation claim.

---

[11] The Court need not consider whether MISC's claim of negligent misrepresentation fails under the economic loss doctrine, as APC urges, because the claim fails otherwise based on lack of evidence of justifiable reliance.